# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CR-13-06-RAW |
| | ) | |
| ERNEST DRY, III, and | ) | |
| RALPH GENE CARLOSS, | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

Defendants Ernest Dry III and Ralph Gene Carloss were indicted for conspiracy to possess pseudoephedrine in violation of 21 U.S.C. § 846 and assorted weapons charges. The evidence supporting the charges was seized from Dry's house during execution of a search warrant obtained on the basis of incriminating evidence observed in plain view by officers who followed Carloss into the house let officers after conducting a "knock and talk" outside. The Defendants urge suppression of the incriminating evidence on the theory that Carloss lacked authority to allow the officers into Dry's home and that the resulting search warrant was therefore based upon illegally obtained information. Dry's Motion to Suppress [Docket No. 28] and Carloss' Motion to Adopt Motion to Suppress [Docket No. 34] were referred to the undersigned Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(2)(B), and an evidentiary hearing was held on March 8, 2013. For the reasons set forth below, the Defendant's motions should be denied.

## A. Factual Summary

On August 23, 2012, an ATF agent and an investigator from the Tahlequah police department conducted a "knock and talk" at Dry's house to investigate complaints of firearms and drug activity. The officers arrived sometime in mid-afternoon and were dressed in plainclothes. There were "No Trespassing" signs posted on the property, but the officers approached the front door and knocked, but nobody answered. The officers heard movement inside and continued knocking for several minutes. Eventually Heather Wilson exited the back door and spoke to the officers, who introduced themselves, told her why they were there and asked if anyone else was inside. Ms. Wilson indicated that Carloss, Dry and Katy Homberger were in the house.

While the officers were talking to Ms. Wilson, Carloss came out the back door and joined the conversation. The officers again identified themselves and told Carloss they were there to investigate complaints of drug activity and firearms. The officers asked Carloss who lived at the house, and he indicated that he had a room there but the house belonged to Dry. The officers asked Carloss for permission to search the house, to which Carloss responded, "Let me go get the man of the house." *See*, Def. Dry's Ex. 1. The officers asked Carloss if they could go inside with him, and Carloss said, "Sure." *Id.* The officers followed Carloss through the back door into a storage area or "mud room," then through an open door into a room Carloss identified as his own. Once inside this room, the officers observed a razor blade with white powdery residue and a red cut straw, which officers believed to be drug paraphernalia, on a table in plain view, but the officers

did not search the room. Ms. Homberger and Dry then came into Carloss' room through a doorway covered by a blanket, and the officers again explained who they were and why they were there. They asked Dry for permission to search the house, then waited while he called his attorney. Dry asked if the officers had a search warrant, and since they did not, he asked them to leave. The officers left without searching the house, but later returned with a search warrant based upon the drug paraphernalia they had observed in plain view in Carloss' room. A search of the house revealed drugs, paraphernalia, equipment for manufacturing drugs, firearms, ammunition, blasting caps and other evidence.

**B. Analysis**

The Defendants do not directly challenge the validity of the search warrant, but do contend that the information on which it was based, *i. e.*, the drug paraphernalia observed in plain view on a table in Carloss' room, was obtained illegally because Carloss had no authority to allow the officers into the room. They also contend that even if Carloss *did* have authority to allow the officers inside the house, his consent was involuntary, and that the original entry onto the property by the officers for a "knock and talk" was illegal because of the "No Trespassing" signs. The latter two contentions were not addressed in the suppression motions, but they were raised at the evidentiary hearing. None of these contentions are persuasive, and the suppression motions should therefore be denied.

### 1. The "No Trespassing" Signs

At the evidentiary hearing, the Defendants focused much attention on the presence of "No Trespassing" signs posted conspicuously on the property. Although the officers did not recall seeing such signs during their first visit to the house for a "knock and talk," the record reflects that several "No Trespassing" signs *were* posted. But the Defendants' focus on these signs (and on the law of trespass) is clearly misplaced. The pertinent issue is not whether the officers trespassed upon Dry's property in conducting their "knock and talk," but instead whether any trespass "infringe[d] upon the personal and societal values protected by the Fourth Amendment." *Oliver v. United States,* 466 U.S. 170, 182-183 (1984). *See also United States v. Lakoskey*, 462 F.3d 965, 973 (8th Cir. 2006) ("[U]nder the Fourth Amendment, the question is not whether the officers were trespassing, but whether Thomas had a reasonable expectation of privacy."), *citing United States v. Ventling*, 678 F.2d 63, 66 (8th Cir. 1982) ("The standard for determining when the search of an area surrounding a residence violates fourth amendment guarantees no longer depends on outmoded property concepts, but whether the defendant has a legitimate expectation of privacy in that area.").[1] Such protection extends to the home and its curtilage, *i.e.*, the area that "harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." *United States v. Dunn,* 480 U.S. 294, 300 (1987)

---

[1] The undersigned Magistrate Judge is not convinced that the officers did in fact trespass. Dry's mother testified at the evidentiary hearing that she had the "No Trespassing" signs posted on the property when her daughter lived there so patrons from a nearby bar would not wander onto the property accidentally. She added that the signs were not intended to prevent police officers from performing their duties. But in any event, "under the Fourth Amendment, the question is not whether the officers were trespassing, but whether [the Defendants] had a reasonable expectation of privacy." *Lakoskey,* 462 F.3d at 973, *citing Ventling,* 678 F.2d at 66.

[internal quotations omitted]. To determine if the "knock and talk" conducted by the officers in this case invaded the curtilage of Dry's home and thus violated the Fourth Amendment, the Court must consider four factors: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *United States v. Cavely*, 318 F.3d 987, 993-94 (10th Cir. 2003), *quoting Dunn*, 480 U.S. at 301. Based on these factors, the undersigned Magistrate Judge concludes that the officers did not invade the curtilage of Dry's home to conduct their "knock and talk."

Before following Carloss into the house, the officers entered the property through the driveway, went onto the front porch and stood at the front door, went around the side of the house to talk to Ms. Wilson and Carloss and finally approached the back door to the house adjacent to a carport on the side (not the rear) of the house. Although some of these areas were undoubtedly very close (if not adjacent) to the house, there was no surrounding enclosure and the entire area was clearly visible from the street. Further, although it is not entirely clear what these areas were used for, it is the Defendants who bear the burden of proof on this point, *see, e. g., Cavely*, 318 F.3d at 994 ("[T]he burden of establishing a legitimate expectation of privacy is on the party claiming a Fourth Amendment violation . . . and we have applied that same rule to a claimed invasion of the curtilage."), *citing United States v. Rascon*, 922 F.2d 584, 587 (10th Cir. 1990), and there is nothing to suggest that any of these areas were used for "intimate activity associated

with the sanctity of a man's home and the privacies of life." *Dunn,* 480 U.S. at 300. In sum, the undersigned Magistrate Judge concludes that the "knock and talk" conducted on Dry's property did not invade the curtilage of his home or violate the Fourth Amendment. *Accord, United States v. Larson*, 63 Fed. Appx. 416, 424 (10th Cir. 2003) ("[T]he front porch did not constitute part of the building's curtilage . . . neither the presence of the chain-link fence, through which the officers could see, nor the fact that the front door window had been painted was sufficient to create any reasonable expectation of privacy with regard to the front porch area. The officers' entry onto the porch, for the purpose of knocking on the front door, did not violate Larson's Fourth Amendment rights.") [citations omitted]; *Rieck v. Jensen,* 651 F.3d 1188, 1193 (10th Cir. 2011) ("[A] driveway abutting and clearly visible from a public highway is not a suitable setting for intimate activities associated with a home.").

## 2. Authority to Consent to Entry into the House

"The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects. The prohibition does not apply, however, to situations in which voluntary consent has been obtained, either from the individual whose property is searched, or from a third party who possesses common authority over the premises." *Illinois v. Rodriguez,* 497 U.S. 177, 181 (1990) [internal citations omitted]. *See also United States v. Matlock,* 415 U.S. 164, 171 (1974) ("[W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show

that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected."). A third party's authority to consent may be either actual or apparent; actual authority is shown by "(1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it[,]" *United States v. Cos*, 498 F.3d 1115, 1125 (10th Cir. 2007), *citing United States v. Rith*, 164 F.3d 1323, 1329 (10th Cir. 1999), but apparent authority exists when "a police officer reasonably, but erroneously, believes that the third party has actual authority to consent." *Id.* at 1128, *citing Georgia v. Randolph*, 547 U.S. 103, 109 (2006). Thus, a third party has apparent authority when officers reasonably believe he has mutual use of the property through joint access or control over it for most purposes. *Id.* at 1128, *citing Rith*, 164 F.3d at 1329.

The Defendants argue that Carloss had no authority to consent as evidenced by his statement that he would have to "get the man of the house" in response to the officers' request to search the residence. But the issue here is not whether Carloss had authority to consent to a search of the home (he clearly indicated to the officers that he did not), but instead whether he had the authority to consent to entry into the home by the officers. And the undersigned Magistrate Judge concludes that Carloss *did* have such authority for several reasons. First, Carloss exited the back door of the house and spoke to the officers in response to their knocks at the front door, which suggests a greater degree of dominion over the house than a visitor would have. Second, Carloss told the officers that although it was not his house, he did have a room, which was separated from the rest of the house

by a blanket-covered doorway. This demonstrated control by Carloss for most purposes, at least as to this room. Third, Carloss accessed his room at the house through the back door and a storage room or "mud" room, which demonstrated mutual use by joint access, at least as to those portions of the house. *See, e. g., Matlock*, 415 U.S. at 172, fn. 7 ("The authority which justifies the third-party consent does not rest upon the law of property . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes").[2] Finally, Carloss himself clearly understood the distinction between authority to consent to search and authority to consent to entry by the officers; when asked about a search, he immediately deferred to the "man of the house" Dry, but when asked about being accompanied inside, he assented and led the officers through the back door into his room and left them there while he went after Dry. A different route might have led more directly to Dry, but Carloss apparently chose to take the officers and leave them where he had authority to do so. Under a totality of these circumstances, the undersigned Magistrate Judge is satisfied that Carloss had actual authority to allow the officers into his room, but even if he did not, his actions and words created a reasonable belief that he did have such authority.

---

[2] Carloss testified at the evidentiary hearing that he was only a visitor and did not live at Dry's home. He also testified that the officers never asked for permission but simply followed him into the house when he went to get Dry. If such testimony were persuasive, the undersigned Magistrate Judge would likely be constrained to conclude that Carloss *did* lack authority to consent to entry into the house by the officers. But the undersigned Magistrate Judge finds the testimony of the officers on these points more persuasive, *i. e.*, Carloss was not just a visitor, but did in fact have a room at Dry's house in which he was living, and he agreed when the officers asked to accompany him inside. As discussed above, if Carloss was nothing more than a visitor, it seems unlikely that he would have had access to the back door of the house, or that he (rather than the "man of the house" Dry) would have come outside to talk in response to the officers' knock at the front door.

### 3. Voluntariness of Consent

Both officers testified that they would not have let Carloss go into the house alone to get Dry because of concerns for their own safety. Although the subjective intentions of the officers are irrelevant for Fourth Amendment purposes, *see, e. g., United States v. Maher,* 919 F.2d 1482, 1488 (10th Cir. 1990) ("Even if the officers were hoping to find illegal drugs in Maher's trailer, as the district court suspected, such a subjective intent would not invalidate the otherwise legal impoundment because we apply an objective standard in evaluating fourth amendment activity."), it is appropriate to consider whether the consent given by Carloss for the officers to enter the house was voluntary. *See, e. g., United States v. Sanchez,* 89 F.3d 715, 718-19 (10th Cir. 1996) ("When the government relies on a defendant's consent for the validity of a search, the government bears the burden of proving that defendant's consent was freely and voluntarily given, a determination we make by evaluating the totality of the circumstances."), *citing United States v. McRae,* 81 F.3d 1528, 1536–37 (10th Cir. 1996). There is a two-part test for determining whether a consent is voluntarily given: "First, the government must proffer 'clear and positive testimony that consent was unequivocal and specific and freely and intelligently given.' Furthermore, the government must prove that this consent was given without implied or express duress or coercion." *McRae,* 81 F.3d at 1537, *quoting United States v. Angulo–Fernandez,* 53 F.3d 1177, 1180 (10th Cir. 1995), *quoting United States v. Dewitt,* 946 F.2d 1497, 1500 (10th Cir. 1991), *cert. denied,* 502 U.S. 1118 (1992).

Factors to consider in determining whether consent is voluntarily given include the following:

> [T]he threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a nonpublic place or a small, enclosed place; and absence of other members of the public.

*United States v. Guerrero,* 472 F.3d 784, 790 (10th Cir. 2007), *quoting Sanchez,* 89 F.3d at 718. Application of these factors to the totality of the circumstances indicates that the consent to enter the house given by Carloss to the officers *was* voluntary.

The testimony at the evidentiary hearing indicated a casual, daylight "knock and talk" by two officers dressed in plainclothes. They did not brandish weapons, use any physical force or aggressive language or tone of voice, or take possession of any personal effects. They interacted with Carloss and Ms. Wilson outside the house in an area visible to the public. They specifically asked Carloss if they could accompany him into the house to get Dry, and although they apparently did not advise him that he could refuse consent, he was undoubtedly aware he could refuse because he did refuse when asked about searching the house. *See, e. g., United States v. Doyle,* 129 F.3d 1372, 1377 (10th Cir. 1997) ("[O]ur cases dictate the conclusion that failure by law enforcement officials to advise a detainee of his Fourth Amendment right to refuse consent does not necessarily require a finding that consent was involuntary."), *citing United States v. Sanchez–Valderuten,* 11 F.3d 985, 990 (10th Cir. 1993) ("Whether a defendant is informed that he

need not consent to a search is only one factor in determining whether consent was voluntary."), *citing United States v. Ward,* 961 F.2d 1526, 1533 (10th Cir. 1992). There is no evidence of any duress or coercion, and nothing to indicate that Carloss' consent was equivocal nor unintelligently given. The undersigned Magistrate Judge therefore concludes that Carloss' consent was voluntary.

### C. Conclusion

In summary, the undersigned Magistrate Judge finds: (i) that the "knock and talk" conducted by the officers in this case was lawful under the Fourth Amendment despite the "No Trespassing" signs posted on the property; (ii) that Carloss had the authority to consent to the officers' entry into the residence and did in fact consent; and, (iii) that the consent given by Carloss for the officers to accompany him into his room was voluntarily given. The incriminating evidence observed by the officers in plain view in Carloss' room was thus legally obtained, and properly formed the basis of probable cause for the search warrant executed thereafter. The evidence seized from Dry's house pursuant to the search warrant should therefore not be suppressed, and the Defendant's suppression motions should be denied.

Accordingly, the undersigned Magistrate Judge PROPOSES the findings set forth above and RECOMMENDS denial by the Court of Dry's Motion to Suppress [Docket No. 28] and Carloss' Motion to Adopt Motion to Suppress [Docket No. 34]. Objections to this Report and Recommendation must be filed within fourteen (14) days. *See* Fed. R. Civ. P. 72(b).

IT IS SO ORDERED this 21st day of March, 2013.

Steven P. Shreder
United States Magistrate Judge
Eastern District of Oklahoma